UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA                      03-CR-172E
                                                                               MEMORANDUM
             -vs-                                                                          and

DUSTIN L. McCARGO                                                          ORDER[1]

---

        Defendant Dustin L. McCargo was named in a one-count indictment for being a felon in possession of a firearm and a quantity of ammunition in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). The undersigned referred this case to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. §§636(b)(1)(A) and (B) for all pre-trial matters and to hear and report upon dispositive motions. McCargo, on May 14, 2004, moved to suppress the evidence seized and the statements that he had allegedly made after his arrest ("Suppression Motion") and moved to dismiss the indictment ("Dismissal Motion").[2] A suppression hearing — in which testimony and evidence were presented by both parties as they pertained to the Suppression Motion ("Transcript")[3] — was held by Judge Schroeder on June 18, 2004. Judge Schroeder issued his Report and Recommendation ("R&R") on

---

[1] This decision may be cited in whole or in any part.

[2] In his May 14, 2004 Motion, McCargo sought, *inter alia*, (1) suppression of evidence, (2) suppression of statements, (3) dismissal of the indictment for due process and speedy trial violations, (4) discovery and inspection, (5) disclosure of evidence pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence, (6) disclosure of witnesses' statements and (7) preservation of rough notes. This Order addresses Judge Schroeder's response to the first three requests for relief. For the sake of clarity, this Order will refer to the requests to suppress the evidence and statements as the "Suppression Motion" and the request to dismiss the indictment as the "Dismissal Motion", although they were made in a single motion.

[3] The transcript of the evidentiary hearing was filed with the Clerk of the Court (docket no. 13).

February 25, 2005, in which he recommended that McCargo's Suppression Motion be granted and his Dismissal Motion be denied.  On March 8, 2005 the government filed objections to the portion of the R&R addressing the Suppression Motion ("Objections") and McCargo filed his Response to the Government's Objections on May 16, 2005 ("Response"). For the reasons set forth below, the R&R will be adopted in its entirety and the government's Objections will be overruled.

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate" and may adopt those parts of the R&R to which no *specific* objection is raised, so long as such are not clearly erroneous.  28 U.S.C. §636(b)(1)(c); *see also Black* v. *Walker*, 2000 WL 461106, at *1 (W.D.N.Y. 2000). Conversely, the undersigned must make a *de novo* determination with respect to those portions of the R&R to which specific objections have been made.  28 U.S.C. §636(b)(1)(c); *United States* v. *Raddatz*, 447 U.S. 667, 675-676 (1980); *Sieteski* v. *Kuhlmann*, 2000 WL 744112, at *1 (W.D.N.Y. 2000).  The Objections satisfy Rule 58.2(a)(3) of the Local Rules of Criminal Procedure ("LRCrP"), which states:

> "The written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."

The undersigned will make a *de novo* determination of the Objections and review the remaining issues for clear error.

The R&R sets forth the facts in detail — which are not in dispute and are based on testimony and evidence presented at the suppression hearing — and thus only a brief

reiteration is necessary here. Officers Christopher Sterlace and Mark White of the Buffalo Police Department were on patrol duty, in uniform and in a marked Buffalo Police car on July 28, 2003 when they received a radio message from the Buffalo Police Radio Dispatcher, which stated that there was an attempted breaking and entering occurring at 501 Berkshire Avenue. No information was given about the race or gender of the individuals attempting to break into the house or about whether they had any weapons; the only information known was that there allegedly was more than one person involved. The Officers were less than two blocks from the address and proceeded towards the crime scene.

The Officers arrived at the corner of Berkshire and Suffolk — an area that they described as a "high crime area" (Tr., at 11, 63) — and saw another Buffalo Police patrol car at the crime scene approximately 200 feet from the intersection of Berkshire and Suffolk. The Officers observed McCargo as he was crossing Berkshire northbound on Suffolk and noticed that he was focused on the other patrol car — so much so that he did not notice the Officers' car. This fact aroused the Officers' suspicions that maybe McCargo knew what was going on with regards to the alleged break-in. The Officers pulled over to McCargo and — in their own words — "command[ed]" McCargo to come to the police car. (Tr., at 58.) McCargo "compliant[ly]" came over. *Ibid.* The Officers originally intended to explain to McCargo that a burglary was in progress at 501 Berkshire and to determine if he would go to the scene for a show-up identification. If McCargo had gone back to the scene and had not been identified, he would not have been restrained.

The Officers exited the patrol car and directed McCargo to come to the police car and put his hands on the car for a pat down search. The Officers testified that they conducted the pat down search because McCargo was going to be seated in the back of the patrol car and a pat down search in such situations was department policy for the safety of the officers — to wit, in order to prevent placing someone who is armed with a dangerous weapon in the rear seat of a police vehicle. During the pat down search, the Officers discovered a gun in McCargo's waistband. The Officers then forced McCargo to get down on the ground and told him not to move. Roughly one minute had elapsed between the time the Officers first saw McCargo and when they found the gun, and two minutes and thirty-eight seconds had elapsed from the time the Officers advised the police dispatcher that they were proceeding to the scene and when they dealt with McCargo.

The Officers did not give McCargo his "Miranda warnings" after placing him under arrest and in the back seat of the patrol car. Instead, Lt. Mark Taggert of the Buffalo Police Department arrived on the scene and gave McCargo his Miranda warnings, after which McCargo was transported to Buffalo Police Headquarters. McCargo acknowledged receiving and understanding his Miranda warnings, but did not do so by signing a form because such was not asked of him. McCargo remained silent until he arrived in the cell block where he was recognized by Cell Block Attendant Roger Sanna. Sanna asked him why he was there. McCargo replied that he had had a "little gun" on him. Sanna then asked him "how little", to which McCargo replied "just a .357". (Tr., at 26-27, 72-73.) This Court, in following the

format of the R&R, will first make a *de novo* review of whether the evidence and subsequent statements should be suppressed and then review the Dismissal Motion for clear error.

In addressing the suppression of evidence issue, the R&R employed the two-part legal analysis enunciated by the Supreme Court in *Terry* v. *Ohio*, 392 U.S. 1 (1968), for determining whether allegedly investigatory stops ("*Terry* stops") — such as the one at issue here — violate the Fourth Amendment. In so doing, the R&R first addressed whether the Officers had "reasonable suspicion to believe that criminal activity 'may be afoot' so as to justify the 'investigatory stop'" and then addressed whether the Officers had "a reasonable basis for believing" that McCargo was armed thereby justifying the pat down search and seizure of the gun found on him. (R&R, at 8.) The R&R found that it was reasonable for the Officers to believe that "criminal activity was afoot" in the area of Berkshire and Suffolk, but that the Officers did not have a reasonable basis for believing that McCargo was armed so as to justify the frisking of him and the seizure of the gun from him. The R&R based these findings on the facts that, although the Officers were in a dangerous area and were responding to a 911 call, McCargo was not acting in a threatening manner, was not in the process of flight and did not appear to be "armed and dangerous". The R&R also found that staring at a police car is a "common human trait" that, without more, should not raise suspicion sufficient to warrant a pat down search. Finally, the R&R found that the "department policy" of patting down persons who are to be placed in the back of a patrol car for "officer safety" does not satisfy the requirements of the Fourth Amendment and does not comport with the principles enunciated in *Terry*.

The Objections did not dispute the R&R's finding that the Officers had sufficient "reasonable suspicion" that "criminal activity was afoot" to justify their initial stop of McCargo. McCargo, in his Response, objected to this finding, but did not do so within the allotted ten days following the filing of the R&R. *See* Fed. R. Crim. P. 58(g)(2); LRCrP 58.2. As such, the undersigned's review of this finding need only be for clear error, although a slightly more detailed analysis is necessary to adequately address the Objections. The Supreme Court has held that brief investigatory stops of persons that fall short of a traditional arrest satisfy the Fourth Amendment if "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot'". *United States* v. *Arvizu*, 534 U.S. 266, 273 (2002) (citations and quotations omitted). This standard, which falls short of what is required for probable cause, is based on the "totality of the circumstances" of each case to determine if there is a "'particularized and objective basis' for suspecting legal wrongdoing." *Ibid*. (citations and quotations omitted). The undersigned agrees with the R&R that it was reasonable for the Officers to believe that "criminal activity was afoot" in the area of Berkshire and Suffolk. First, they received a 911 call stating such. Furthermore, the Officers were in a high crime area at a high crime time of night. Hence, Judge Schroeder did not err in finding that the Officers were reasonable for briefly detaining McCargo for purposes of making an investigatory stop under the principles set forth by the Supreme Court in *Terry*.

The government did object to the R&R's finding as to the second prong of the *Terry* inquiry. The R&R found that the Officers did not have a "reasonable suspicion" to justify patting down McCargo and therefore recommended that the gun and ammunition

seized from McCargo be suppressed. The undersigned will make a *de novo* determination as to whether the pat down search was justified and, based on the totality of the circumstances, will overrule the government's objection and adopt the R&R's recommendation that the gun seized as a result of the pat down search should be suppressed because the pat down was not an appropriate step following the valid *Terry* stop.

A pat down search following a *Terry* stop is justified if it is reasonable. The test is whether, under the circumstances, the "officer is justified in believing that the [person] is armed and presently dangerous to the officer or others." *Terry*, at 24. In other words, does the officer have a *reasonable suspicion* that the defendant was armed and dangerous. *Terry*, at 27 (emphasis added). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'" that a person may be engaged in some illicit activity. *United States* v. *Sokolow*, 490 U.S. 1, 7 (1989) (citation and quotations omitted). By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime. *United States* v. *Cortez*, 449 U.S. 411, 421 (1981). Reasonable suspicion, therefore, is an intermediate standard that cannot be precisely defined, but must be determined on a case-by-case basis taking into consideration the totality of circumstances. *Sokolow*, at 8; *Florida* v. *Royer*, 460 U.S. 491, 516 (1983).

The government claims that the inquiry is not whether the Officers possessed reasonable suspicion that McCargo was armed with a dangerous weapon, but rather whether their actions were "reasonably" related in scope to the circumstances that justified the *Terry*

stop. In making this distinction, the government cites a recent Supreme Court decision, *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 124 S.Ct. 2451 (2004), and a Second Circuit decision, *United States v. Glover*, 957 F.2d 1004 (2d Cir. 1992). Neither of these cases, however, addresses a pat down search of an individual justified almost exclusively on the general need for or policy of "officer safety". In fact, none of the cases that the government cited in support of its position involved a pat down search of a defendant. *See, e.g., Hiibel*, at 2459 (finding that "[t]he principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop"); *Glover*, at 1010-1013 (finding that the officers had reasonable suspicion to detain the defendant because he, *inter alia*, made false representations, refused consent to search his bags and was sweating heavily and shaking nervously).

The fact that this case involves a pat down search is a key component to the analysis because an inquiring court must balance "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985). To keep this balance true, the court must make a practical, commonsense judgment based on the idiosyncrasies of the case at hand. *Ornelas v. United States*, 517 U.S. 690, 695-696 (1996). Thus, once it is established, as it is here, that the officers' actions were justified at their inception, the question becomes whether the officers' subsequent actions were fairly responsive to the emerging tableau — to wit, the circumstances originally warranting the stop, informed by what occurred and what the officers learned as the stop progressed. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir.

2001); *see also United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) ("The propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold."). An officer may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the stop. *See Terry*, at 10 (observing that "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess"). Officer safety is a valid justification for a pat down search or protective frisk only when the officer "observes *** that the persons with whom he is dealing may be armed and presently dangerous". *Id.* at 30.

With these tenets in mind, a review of the facts known to or inferable by the Officers at the time of the pat down will determine that the R&R was correct in finding that the pat down was not reasonable. As the government cites in its Objections, the Officers were aware of the following facts: (1) a burglary was in progress approximately 200 feet from where they first saw McCargo; (2) some of the persons who were attempting to burglarize the residence had gone around to the rear of the residence; (3) McCargo was walking from an area that could have been from where one fleeing the scene would have been coming; (4) McCargo was the only person in the immediate area; (5) the 911 call was received less than three minutes from the time the Officers saw McCargo; (6) the area was a high crime area; and (7) McCargo was staring intently at the other police car. The Officers also observed that McCargo did not attempt to flee, was very compliant, did not act in a threatening manner, did not appear to have any weapons on him and did not reach for a weapon.

As evident from these facts, the Officers' suspicions did not mount during the course of the stop; if anything, the Officers' suspicions should have decelerated due to McCargo's non-threatening, compliant and inconspicuous demeanor. There was no indication that McCargo was armed and presently dangerous and such is required for a pat down pursuant to a *Terry* stop. *See Terry*, at 30. Furthermore, the government does not allege that the Officers thought that McCargo was armed and dangerous, but that they were simply following department policy. Department policy does not, however, protect the conduct from being a violation of the Fourth Amendment. Therefore, the pat down search violated McCargo's Fourth Amendment rights and suppression of the gun discovered by the illegal search is necessary. The undersigned, as such, will overrule the government's objection and will adopt the R&R's recommendation.

The government next objects to the R&R's finding that McCargo's statement should be suppressed as "fruits of the poisonous tree" resulting from the illegal search and arrest of McCargo. In particular, the government argues that, because the discovery of the gun was legitimate and not a violation of McCargo's Fourth Amendment rights, any statements made by him subsequent to his arrest and having been advised of his Miranda warnings are legitimately obtained and should be allowed as evidence. As held above, however, the basis for the government's argument — that the discovery of the gun did not violate McCargo's Fourth Amendment rights — is invalid, and it therefore follows that the government's argument is also invalid. Nonetheless, the undersigned will make a *de novo* review of the

issue and will uphold the R&R's recommendation that McCargo's statements to Sanna should be suppressed.

A confession subsequent to a Fourth Amendment violation should be suppressed due to the "fruit of the poisonous tree" doctrine "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (citations and quotations omitted). The Supreme Court has explained that Fourth Amendment violations — such as the one in this case — "have traditionally mandated a broad application of the 'fruits' doctrine." *Ibid.* ("The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits."). For a confession that follows a Fourth Amendment violation to be admissible, there must be "a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation." *Ibid.; see also Dunaway v. New York*, 442 U.S. 200, 218 (1979) ("When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts."); *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975) (finding that, although a determination whether a confession is a product of free will rather than the fruits of a Fourth Amendment violation is via a case-by-case analysis, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.") (citations omitted).

Here, there was no break in events or intervening circumstance to suggest that the confession was caused by anything other than the Fourth Amendment violation. Very little time elapsed from when McCargo was arrested, taken to booking headquarters, booked and confronted by Sanna. The temporal proximity and close causal connection between the illegal seizure of the gun and the statements made by McCargo require the suppression of McCargo's statements as "fruits of the poisonous tree". Therefore, the R&R's finding will be adopted and the government's objections will be overruled.

Finally, the government did not object to the R&R's denial of the Dismissal Motion. McCargo, however, did so object in his Response, but, again, McCargo's objections were not timely. Thus, only a review for clear error is necessary and the undersigned finds no such error and will adopt the R&R's finding that McCargo has failed to establish that he has been deprived of his Sixth Amendment right to a speedy trial or that his rights under the Speedy Trial Act, 18 U.S.C. §3161, have been violated.

Accordingly, it is hereby **ORDERED** that the government's Objections are overruled and that Judge Schroeder's Report and Recommendation dated February 25, 2005 (docket no. 21) is adopted in its entirety.

DATED:    Buffalo, N.Y.
         June 27, 2005

               */s/ John T. Elfvin*
               JOHN T. ELFVIN
               S.U.S.D.J.